**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 30 1998**

**PATRICK FISHER**
**Clerk**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JEANNE HARRISON,

    Plaintiff-Counter-Defendant-
    Appellant,

      v.

EDDY POTASH, INC., a New Mexico
corporation; ROBERT L. BROWN,

    Defendants-Counter-Claimants-
    Appellees.

No. 96-2045

---

JEANNE HARRISON,

    Plaintiff-Counter-Defendant-
    Appellee,

      v.

EDDY POTASH, INC., a New Mexico
corporation,

    Defendant-Counter-Claimant-
    Appellant,

      and

ROBERT L. BROWN,

    Defendant-Counter-Claimant.

No. 96-2065

**OPINION ON REMAND**

Appeal from United States District Court
for the District of New Mexico
(D.C. No. CIV-94-691-JP)

Floyd D. Wilson (Richard D. Barish with him on the brief), of McCary, Wilson & Pryor, Albuquerque, New Mexico, for the plaintiff-counter-defendant-appellant.

W.T. Martin, Jr. (Stephen S. Shanor with him on the brief), of Martin & Shanor, Carlsbad, New Mexico, for the defendant-counter-claimant-appellee.

Before **BRISCOE**, **McWILLIAMS**, and **LUCERO**, Circuit Judges.

**BRISCOE**, Circuit Judge.

This appeal is before us on remand from the United States Supreme Court for further consideration in light of <u>Faragher v. City of Boca Raton</u>, 118 S.Ct. 2275 (1998). Having reviewed <u>Faragher</u> and the parties' supplemental briefs, we conclude the judgment in favor of defendant Eddy Potash, Inc., and against plaintiff Jeanne Harrison on her Title VII sexual harassment claim must be reversed and remanded for further proceedings.

I.

Harrison brought this action against her supervisor, Robert Brown, and her employer, Eddy Potash, alleging hostile work environment sexual harassment in violation of Title VII of the Civil Rights Act of 1964 and various pendent state law claims. A complete recitation of the factual background of this case is contained in our prior opinion. See Harrison v. Eddy Potash, Inc., 112 F.3d 1437 (10th Cir. 1997) (Harrison I). A jury returned a verdict in favor of Harrison and against Brown on state law claims of intentional infliction of emotional distress and battery, but found against Harrison and in favor of Eddy Potash on the Title VII claim. Harrison appealed the jury's verdict on her Title VII claim, contending the district court erroneously instructed the jury concerning the requirements for imposing liability on an employer for sexual harassment perpetrated by a supervisory employee. Eddy Potash filed a cross-appeal claiming the district court lacked jurisdiction to entertain Harrison's Title VII claim because she failed to comply with grievance procedures set forth in her union's collective bargaining agreement (CBA).

In Harrison I, we rejected Eddy Potash's cross-appeal, concluding Harrison's failure to invoke the CBA's grievance procedure did not bar her from pursuing her Title VII claim in federal court. With respect to Harrison's appeal, we concluded the district court failed to properly instruct the jury regarding Eddy Potash's liability under Title VII. Accordingly, we reversed and remanded for

further proceedings on the Title VII claim. Eddy Potash filed a petition for writ of certiorari with the Supreme Court. Following its decision in <u>Faragher</u>, the Supreme Court granted Eddy Potash's petition and summarily vacated our decision and remanded this action to us for further consideration in light of <u>Faragher</u>. <u>Eddy Potash, Inc. v. Harrison</u>, 118 S.Ct. 2364 (1998). Pursuant to our briefing order, both parties have filed supplemental briefs to address the impact of <u>Faragher</u> on this case.

## II.

As we discussed in <u>Harrison I</u>, 112 F.3d at 1443-46, there has been considerable confusion among the circuit and district courts concerning standards governing employer liability under Title VII for sexual harassment perpetrated by supervisory employees. In <u>Faragher</u> and in <u>Burlington Industries, Inc. v. Ellerth</u>, 118 S.Ct. 2257 (1998) (issued the same day as <u>Faragher</u>), the Supreme Court provided much-needed clarification by specifically outlining the various avenues for imposing direct and vicarious liability on an employer for a supervisor's sexual harassment, and by establishing a general standard for imposing vicarious liability on an employer when a supervisor is alleged to have misused his or her delegated authority in sexually harassing a subordinate employee. Because these areas are relevant to the resolution of the appeal now before us, we proceed to review the Court's holdings in greater detail.

Starting from the proposition, first announced in <u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. 57 (1986), that traditional principles of agency law are relevant in determining employer liability under Title VII, the Court in <u>Burlington</u> reviewed Restatement (Second) of Agency §§ 219(1) and (2) and catalogued the various ways in which an employer can be held directly or vicariously liable for a supervisor's sexual harassment. The Court indicated an employer can be held directly liable for a supervisor's sexual harassment "where the employer acts with tortious intent," or where the employer knew or should have known about the harassment but failed to stop it. 118 S.Ct. at 2267. The Court further indicated an employer can be held vicariously liable for a supervisor's harassment (1) under the rare circumstances where "a supervisor engages in unlawful discrimination with the purpose, mistaken or otherwise, to serve the employer," <u>id.</u> at 2266, (2) "where the agent's high rank in the company makes him or her the employer's alter ego," <u>id.</u> at 2267, (3) "in the unusual case" where "there is a false impression that the [harassing employee] was a supervisor, when he in fact was not," and "the victim's mistaken conclusion" regarding the harassing employee's position was reasonable, <u>id.</u> at 2268, or (4) in circumstances where a supervisor has misused his or her delegated authority in perpetrating the harassment. <u>Id.</u>[1]

---

[1] In <u>Faragher</u>, the Court discussed only two of these theories of vicarious liability. <u>See</u> 118 S.Ct. at 2286-90 (scope of employment theory based on

(continued...)

-5-

Ultimately, the Court in Faragher and Burlington focused its attention on vicarious employer liability based upon a supervisor's misuse of delegated authority, a theory relied on by plaintiffs in both cases. The Court began its analysis by outlining what it termed "good reasons for vicarious liability for misuse of supervisory authority." Faragher, 118 S.Ct. at 2291. The Court noted "[t]he agency relationship affords contact with an employee subjected to a supervisor's sexual harassment, and the victim may well be reluctant to accept the risks of blowing the whistle on a superior." Id. The Court noted "[w]hen a person with supervisory authority discriminates in the terms and conditions of subordinates' employment, his actions necessarily draw upon his superior position over the people who report to him, or those under them, whereas an employee generally cannot check a supervisor's abusive conduct the same way that she might deal with abuse from a co-worker." Id. Finally, the Court noted employers "ha[ve] a greater opportunity to guard against misconduct by supervisors [through screening, training, and performance monitoring] than by common workers." Id.

[1](...continued)
Restatement § 219(1)), and 2290-93 (misuse of delegated authority theory based on Restatement § 219(2)(d)). The Court also acknowledged the theory of direct liability based on an employer's failure to respond after it knew or should have known of the alleged harassment, but found it unnecessary to discuss that theory in detail. Id. at 2294. In Wright-Simmons v. City of Oklahoma City, 155 F.3d 1264 (10th Cir. 1998), we recently discussed two theories of vicarious liability and one theory of direct liability in the context of considering a hostile environment racial harassment claim.

-6-

Notwithstanding these reasons, however, the Court emphasized this theory of vicarious liability could not be recognized under Title VII unless it was "square[d] . . . with <u>Meritor</u>'s holding that an employer is not 'automatically' liable for harassment by a supervisor who creates the requisite degree of discrimination." <u>Id.</u> The Court concluded the only viable way to do so was "to recognize an affirmative defense to liability in some circumstances, even when a supervisor has created the actionable environment." <u>Id.</u> Accordingly, the Court adopted the following standard for vicarious employer liability for a supervisor's misuse of delegated authority:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. R. Civ. P. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employee had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense. No affirmative defense is available, however, when the

> supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

Id. at 2292-93; Burlington, 118 S.Ct. at 2270.

III.

Our task now is to apply the holdings outlined above to the case before us. In her appeal, Harrison asserted the district court erred by failing to properly instruct the jury on three theories of vicarious employer liability: (1) liability resulting from Brown's high degree of managerial control over her; (2) liability resulting from Brown's apparent authority to commit the sexual harassment; and (3) liability resulting from Brown's misuse of actual supervisory authority. We address the theories in order.

*High degree of managerial control*

Harrison asserted Eddy Potash could be held vicariously liable for the actions of Brown because Brown exercised significant control over her conditions of employment and could thus be considered the "alter ego" of Eddy Potash. In Harrison I, we rejected this theory of liability, concluding it was based upon a misreading of our opinion in Sauers v. Salt Lake County, 1 F.3d 1122 (10th Cir. 1993) (discussing whether a Title VII claim asserted against an individual defendant with significant control over the plaintiff could operate as a claim against the employer itself), and concluded the district court did not abuse its

-8-

discretion in denying Harrison's requested instruction on this theory.  Id. at 1451.

Nothing in Faragher or Burlington convinces us our conclusion on this point was incorrect.  Although the Supreme Court in Burlington acknowledged an employer can be held vicariously liable under Title VII if the harassing employee's "high rank in the company makes him or her the employer's alter ego," Burlington, 118 S.Ct. at 2267, nothing in that opinion suggests a supervisory employee can be considered an employer's "alter ego" simply because he or she possesses a high degree of control over a subordinate.  Thus, we conclude the district court did not abuse its discretion in refusing to tender Harrison's requested instruction on this theory of liability.[2]

*Apparent authority*

In her second theory of liability, Harrison asserted Eddy Potash should be held vicariously liable because Brown was acting with apparent authority when he sexually harassed her.  More specifically, Harrison asserted that Eddy Potash, through its own conduct, caused her to believe Brown had authority to sexually harass her.  In Harrison I, we concluded this theory was viable, 112 F.3d at 1444,

---

[2]  Nor was Harrison entitled to an instruction under the "alter ego" theory of liability recognized in    Burlington .  The evidence presented at trial clearly indicated Brown was a low-level supervisor who could in no way be considered by a reasonable juror to be the "alter ego" of Eddy Potash.

1446, and further concluded the district court had failed to properly instruct the jury on this theory. Id. at 1448-50.

In light of Faragher and Burlington, we must now reject this theory of liability. In Burlington, the Supreme Court noted that, "[i]n the usual case, a supervisor's harassment involves misuse of actual power, not the false impression of its existence." 118 S.Ct. at 2268. Only in an "unusual case," the Court held, where "it is alleged there is a false impression that the actor was a supervisor, when he in fact was not, [and] the victim's mistaken conclusion [was] a reasonable one," can a theory of employer liability based upon apparent authority be pursued. Id.

*Misuse of actual supervisory authority*

In her final theory of liability, Harrison asserted Eddy Potash was responsible for the sexual harassment because Brown had been aided in accomplishing the harassment by the existence of his actual supervisory authority over her. In Harrison I, we agreed this was a viable theory of liability, 112 F.3d at 1445-46, and concluded the district court abused its discretion in refusing to instruct the jury on this theory. Id. at 1451.

After reviewing Faragher and Burlington, we reaffirm our earlier conclusions. As outlined above, the Supreme Court recognized an employer is

-10-

vicariously liable for misuse of supervisory authority. 118 S.Ct. at 2270; 118 S.Ct. at 2292-93. In this case, the evidence presented at trial clearly indicated Brown had actual and immediate supervisory authority over Harrison and misused that authority to sexually harass her. Thus, Harrison was entitled to have the jury instructed on her "misuse of actual authority" theory of liability against Eddy Potash, and was clearly prejudiced by the district court's failure to do so.

In its supplemental brief, Eddy Potash contends that, notwithstanding any instructional errors, it is entitled to judgment as a matter of law under Faragher and Burlington because the evidence presented at trial demonstrated Brown took no tangible employment action against Harrison, Eddy Potash exercised reasonable care in preventing and promptly correcting any sexual harassment in the workplace, and Harrison unreasonably failed to take advantage of corrective opportunities provided to her by Eddy Potash. Although we agree Brown took no tangible employment action against Harrison, thereby entitling Eddy Potash to assert the affirmative defense outlined in Faragher and Burlington, we disagree that Eddy Potash is entitled to judgment as a matter of law. Aside from the fact that neither prong of the affirmative defense was specifically at issue in the first trial, the evidence actually presented at trial reasonably relating to these prongs is not so one-sided as to entitle Eddy Potash to a judgment in its favor. Indeed, the evidence presented appears to pose serious questions concerning the

-11-

reasonableness of Eddy Potash's conduct in preventing sexual harassment in the workplace. See Harrison I, 112 F.3d at 1442 (although Eddy Potash had in place an official policy against sexual harassment, evidence indicated Harrison had not been made aware of that policy prior to Brown's harassment of her).

We therefore reverse the judgment of the district court in favor of Eddy Potash and against Harrison on her Title VII claim and remand the case to the district court for further proceedings.

IV.

As a final matter, we note that Faragher and Burlington leave untouched our resolution of Eddy Potash's cross-appeal in Harrison I. Accordingly, we reaffirm our holding that Harrison's failure to comply with the grievance procedures set forth in the CBA does not bar her from pursuing her Title VII claim in federal court. See 112 F.3d at 1451-54.

V.

With respect to plaintiff Harrison's appeal (No. 96-2045), we REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion. With respect to defendant Eddy Potash's cross-appeal (No. 96-2065), we AFFIRM the judgment of the district court.

# UNITED STATES COURT OF APPEALS
## Tenth Circuit
## Byron White United States Courthouse
## 1823 Stout Street
## Denver, Colorado 80294
## (303) 844-3157

Patrick J. Fisher, Jr.                                              Elisabeth A. Shumaker

Clerk                                                               Chief Deputy Clerk

May 22, 1997

**TO:**   All recipients of the captioned opinion

**RE:**   96-2045 and 96-2065, Harrison v. Potash
          May 8, 1997

Please be advised of the following correction to the captioned decision:

On page 5, in the last paragraph, the first sentence should read: "On June 27, 1993, plaintiff was again designated..."; that is, "Brown" should be changed to "plaintiff."

Please make the appropriate correction.

Very truly yours,

Patrick Fisher, Clerk

Susie Tidwell
Deputy Clerk

-1-

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 8 1997**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

JEANNE HARRISON,

      Plaintiff-Counter-Defendant-
Appellant,

        v.

EDDY POTASH, INC., a New Mexico
corporation; ROBERT L. BROWN,

      Defendants-Counter-Claimants-
Appellees.

No. 96-2045

---

JEANNE HARRISON,
      Plaintiff-Counter-Defendant-
Appellee,

        v.

EDDY POTASH, INC., a New Mexico
corporation,
      Defendant-Counter-Claimant-
Appellant,

        and

ROBERT L. BROWN,
      Defendant-Counter-Claimant.

No. 96-2065

---

Appeal from United States District Court
for the District of New Mexico
(D.C. No. CIV-94-691-JP)

---

Floyd D. Wilson (Richard D. Barish with him on the brief), of Wilson & Pryor, P.C., Albuquerque, New Mexico, for the plaintiff-counter-defendant-appellant.

W.T. Martin, Jr. (Stephen S. Shanor with him on the brief), of Law Offices of W.T. Martin, Jr., P.A., Carlsbad, New Mexico, for the defendant-counter-claimant-appellee.

---

Before BRISCOE, McWILLIAMS, and LUCERO, Circuit Judges.

---

BRISCOE, Circuit Judge.

---

Plaintiff Jeanne Harrison brought this action under Title VII of the Civil Rights Act of 1964, alleging hostile work environment sexual harassment as well as various pendent state law claims against her supervisor and her employer. A jury returned a verdict in favor of plaintiff and against her supervisor on claims of intentional infliction of emotional distress and battery, awarding compensatory damages of $102,500 and punitive damages of $40,000, but found against plaintiff and in favor of her employer on her Title VII claim. Plaintiff appeals the verdict with respect to her Title VII claim, contending the district court erroneously instructed the jury as to the requirements for imposing liability on the employer. The employer has filed a cross-appeal, claiming the court was without jurisdiction to entertain plaintiff's Title VII claim because plaintiff failed to comply with the grievance procedures set forth in her union's collective bargaining agreement. With respect to plaintiff's appeal, we reverse and remand for further proceedings. As for the employer's cross-appeal, we conclude the court had jurisdiction over plaintiff's Title VII claim and affirm.

I.

Plaintiff is a resident of Carlsbad, New Mexico. Defendant Eddy Potash, Inc., is a New Mexico corporation doing business in Eddy County, New Mexico. Defendant Robert L. Brown is a supervisor employed by Potash. Plaintiff began working for Potash as an underground potash miner in May 1992 and was the only female working with a crew of approximately 30 men. Brown, who worked as the underground shift foreman, was plaintiff's supervisor and was in charge of delegating duties and assigning work to plaintiff. According to plaintiff, Brown was the first person she was required to call if she was sick or wanted to take vacation. Brown was also involved in the disciplinary process.

The miners at Potash had a "buddy system" where each miner was assigned a "buddy" and each set of "buddies" worked together in a section of the mine away from other members of his or her crew. If a miner was not assigned a "buddy" on a particular shift, he or she was designated the "extra person" and was typically assigned to perform miscellaneous duties.

On May 4, 1993, Brown approached plaintiff in an isolated portion of the mine and attempted to kiss her on the mouth. She "pushed him away and told him he was crazy and to get the hell out of there." Append. I at 73. On the following day, Brown ordered plaintiff to leave her work station and accompany him to an abandoned unlit section of the mine to look for empty oil barrels he had allegedly previously noticed. After driving around the mine for awhile, Brown stopped the vehicle and walked around to the side where plaintiff was sitting. He tried to kiss plaintiff, to put his hands on her breasts and between her legs, and to unzip her

-3-

pants. At the same time, Brown made various sexually suggestive comments to plaintiff, including asking her if she wanted to have intercourse or oral sex. Plaintiff pushed Brown away and said "No" to each question. Brown "unbuttoned his pants and exposed his penis, put [plaintiff's] hand on his penis, and he ejaculated." Append. I at 76. Brown then drove plaintiff back to the section of the mine where she normally worked.

On May 15, 1993, plaintiff was working with her "buddy" to fix a broken machine. Brown arrived where they were working and ordered plaintiff to accompany him to the shop to look for a part for the machine. Before arriving at the shop, Brown stopped the vehicle in an unoccupied section of the mine, walked around to plaintiff's side of the vehicle, and again attempted to kiss her, to touch her, and to unzip her pants. Plaintiff repeatedly told Brown "No." Brown started walking back to his side of the vehicle, but turned around and returned to where plaintiff was sitting. He unzipped his pants and said, "'Well, at least I can be happy.'" Append. I at 81. He then forced plaintiff to masturbate him. Brown then drove plaintiff to the shop and ordered the mechanic to drive her back to where she had been working.

On May 24, 1993, plaintiff was working a "graveyard" shift and was designated as the "extra person." Brown ordered her to accompany him to a section of the mine where they were experiencing a high methane gas reading, stating they needed to check the readings and make sure the section had been curtained off correctly. After they completed the work described, Brown drove to a nearby section of the mine that was unoccupied, unlit, and had a low ceiling.

As in the previous incidents, Brown walked around to plaintiff's side of the vehicle and attempted to kiss her, touch her, and unzip her pants. He also made various sexually suggestive comments. Plaintiff again told him "No" and attempted to push him away. Ultimately, Brown exposed himself and forced plaintiff to masturbate him.

On June 7, 1993, Brown ordered plaintiff to clean up around the shifter's office. After she had finished, Brown ordered her to accompany him in taking a load of materials to a section of the mine. On the way, Brown stopped the vehicle at an old unoccupied section of the mine and told plaintiff, "Look, I made us a bed out of [burlap] cloth." Append. I at 91. Brown asked plaintiff to lie down with him and she did. Brown repeatedly asked her to have sex with him and attempted to kiss and touch her, but plaintiff said "No." Brown then forced plaintiff to masturbate him.

During the period of time in which the incidents took place, plaintiff was aware of rumors indicating Brown was going to replace Larry Robertson, who was retiring in the safety office. The safety office was located on the surface and plaintiff believed if Brown went to that position she would not be in contact with him or under his supervision. However, when plaintiff returned to work on June 21, 1993, after a three-day break, she learned Brown would not be replacing Robertson. At that point, she knew the "problem wasn't going to go away," and she "was going to have to do something to put an end to it." Append. I at 94. However, she was scared that no one in management would believe her and that she would lose her job.

On June 26, 1993, plaintiff arrived at work and learned her usual "buddy" had been assigned to work with another miner and she was the "extra person." Afraid Brown would again attempt to harass her, she completed a few of her assigned tasks and told Brown she was sick and was going home.

On June 27, 1993, plaintiff was again designated the "extra person." Brown ordered her to accompany him to shovel some tunnels in the mine. When they arrived, Brown again began harassing her in the identical manner as in the previous incidents. Plaintiff refused his advances and refused to masturbate him. Brown drove plaintiff back to his office and told her to go to her machine and work through lunch. Later that same day, Brown ordered plaintiff to help him clean his office. When they were alone, he again began harassing plaintiff, touching her, and repeatedly asking her to have sex. Plaintiff refused Brown's advances.

On June 28, 1993, plaintiff called the line foreman and told him she was having some problems and needed to take some vacation days to finish out the remainder of her eleven-day shift. On her next scheduled work day (July 5, 1993), plaintiff called in sick. She also called in sick the following day.

On July 7, 1993, plaintiff called Dale Janway, a manager in the safety office, and told him what had happened with Brown. Janway told plaintiff "this is pretty big," and he would have to talk with Ken Leivo, the human resources manager. Append. I at 101. Later that afternoon, Leivo telephoned plaintiff and informed her she would be on administrative leave pending the outcome of his investigation. Leivo also asked plaintiff to prepare a written statement outlining

-6-

what had happened.  Plaintiff and Leivo talked on the telephone several times between July 7 and July 12.  Leivo told plaintiff that Brown had admitted everything but said the incidents were consensual.

On July 14, 1993, Leivo issued a three-page "Determination and Disposition," noting plaintiff's and Brown's versions of what happened were substantially similar, with the exception that Brown alleged the encounters were consensual.  The document stated in pertinent part:

> The absence of any evidence to the contrary, and Ms. Harrison's own testimony, as well as that of Don Frazier [plaintiff's therapist], make Mr. Brown's stated view of the relationship believable.  Therefore, it is my determination that Mr. Brown did not knowingly engage in illegal harassment of Ms. Harrison.
> Nevertheless, because of Mr. Brown's position as Ms. Harrison's supervisor and the authority and intimidation possibilities inherent in that position, it is also my determination that Ms. Harrison's participation in the relationship was truly unwilling and that the situation did cause Ms. Harrison great mental stress.  Her fear of the possibility of losing her job if she filed a complaint, while not necessarily well-founded, was understandably very real to her.
> Furthermore, Mr. Brown's involvement in this activity in the work environment reflects, at the least, extremely poor judgment on his part.  This kind of activity certainly cannot be deemed acceptable by the Company nor can any future activity of this nature be tolerated by Mr. Brown or any other supervisor or employee.
> Because it is impossible to prove the actual nature and extent of this relationship, and because there is no incontrovertible truth available as to the motivations, feelings, and roles of the parties involved, it is determined that no absolute justice may be possible in the resolution of this matter.
> Therefore, after due and deliberate consideration of all possible alternatives available, it is determined that the Company can only take such actions in this case as appear warranted to assure prevention of any continuation or recurrence of the relationship between the parties involved.  Additionally, the Company must accept a moral obligation to assure that Ms. Harrison suffers no monetary loss due to this situation and that any emotional problems found resultant of this situation are properly addressed.

Append. III at 405.  In conclusion, the document indicated that plaintiff would be "made whole for all work time lost as a result of the matter," that she would be

provided with counseling services and necessary medical treatment and prescription drugs, that she would be moved to a different crew in the mine, that Brown would be formally reprimanded for his involvement in the incident, that Brown would "be placed on permanent probation for any future activity of this type," and that Brown would be ordered to have no contact with plaintiff "other than that which might be absolutely necessary as part of his required duties." Id. at 405-06.

Although plaintiff remained on the Potash payroll for approximately one year, she never returned to work. On June 17, 1994, her employment was terminated due to a reduction in force at the mine.

At the time of the described incidents, Potash had in place an official policy against sexual harassment. Plaintiff first became aware of the policy after several of the incidents with Brown had occurred. Specifically, she happened to be working in a different section of the mine than where she normally worked and noticed a copy of the policy posted on that shop's bulletin board. After seeing it, she went home and looked through the materials she was given on her first day of work, but there was no mention of the policy in those materials.

## II.
### *Plaintiff's appeal*

Plaintiff contends the district court erred in instructing the jury on the requirements for imposing Title VII liability on Potash for the hostile work environment sexual harassment committed by Brown. More specifically, she contends the instructions (1) improperly combined two discrete bases for employer liability under title VII, (2) incorrectly informed the jury that Brown

-8-

had to have a high degree of control over plaintiff in order to impose liability on Potash, and (3) incorrectly defined the term "apparent authority." Plaintiff further contends the court erred in rejecting three of her proposed instructions concerning an employer's liability under Title VII for actions of its supervisors.

We review a district court's decision on jury instructions, i.e., whether to give a particular instruction, for abuse of discretion. Allen v. Minnstar, 97 F.3d 1365, 1368 (10th Cir. 1996). As for the instructions themselves, we conduct a de novo review to determine whether, as a whole, they correctly stated the governing law and provided the jury with an ample understanding of the issues and applicable standards. Id.; see also Gardetto v. Mason, 100 F.3d 803, 816 (10th Cir. 1996). "Reversal is warranted only where a deficient jury instruction is prejudicial." Fitzgerald v. Mountain States Tel. and Tel. Co., 68 F.3d 1257, 1262 (10th Cir. 1995).

Because all of plaintiff's arguments on appeal focus on whether the district court correctly instructed the jury with respect to the issue of employer liability under Title VII, we begin by reviewing generally when an employer can be held liable under Title VII for hostile work environment sexual harassment committed by a supervisor.

Title VII prohibits an employer from discriminating against an employee on the basis of sex with respect to "compensation, terms, conditions, or privileges" of employment. 42 U.S.C. § 2000e-2(a)(1). It is well established that this prohibition encompasses sexual harassment in the workplace. Ball v. Renner, 54 F.3d 664, 665 n. 2 (10th Cir. 1995) ("Title VII's prohibition against sex

discrimination includes a ban on sexual harassment"); Hirschfeld v. New Mexico Corrections Dept., 916 F.2d 572, 575 (10th Cir. 1990); Hicks v. Gates Rubber Co., 833 F.2d 1406, 1413 (10th Cir. 1987) ("Sexual harassment . . . is now universally recognized as employment discrimination within the meaning of Title VII.").

For analytical purposes, courts have created two "categories" of sexual harassment. The first, quid pro quo harassment, occurs "where specific benefits of employment are conditioned on sexual demands" by the victim's supervisor. Ball, 54 F.3d at 665 n. 2. The second, hostile environment harassment, occurs "where [a supervisor's or co-worker's sexual] conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986) (quoting 29 C.F.R. § 1604.11(a)(3)); see also Winsor v. Hinckley Dodge, 79 F.3d 996, 1000 (10th Cir. 1996) (defining hostile environment harassment).

Although the distinction between quid pro quo harassment (which is always perpetrated by a supervisor) and hostile work environment harassment perpetrated by a supervisor is often blurred, courts have typically treated the two categories of harassment differently in terms of imposing liability on the employer. In cases involving quid pro quo harassment, courts routinely hold, with little or no discussion, that the employer is "strictly liable" for the supervisor's wrongful conduct. See, e.g., Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 803 (6th Cir. 1994); Virgo v. Riviera Beach Associates, Ltd., 30 F.3d 1350, 1363 n. 9

-10-

(11th Cir. 1994); Karibian v. Columbia University, 14 F.3d 773, 777 (2d Cir.) ("Because the *quid pro quo* harasser, by definition, wields the employer's authority to alter the terms and conditions of employment--either actually or apparently--the law imposes strict liability on the employer for *quid pro quo* harassment."), cert. denied 512 U.S. 1213 (1994). Presumably, this imposition of "strict liability" rests upon the fact that the supervisor was acting within the scope of his actual or apparent authority when he committed the harassment, see Restatement (Second) of Agency § 219(1) and (2)(d) (1958), or because the supervisor "was aided in accomplishing the [harassment] by the existence of the agency relation." Id. § 219(2)(d).

In cases involving hostile work environment sexual harassment, the requirements for imposing liability on the employer are murkier. In 1986, the Supreme Court confirmed in Meritor that hostile work environment sexual harassment violates Title VII, but declined to specifically outline the requirements for imposing liability on an employer when a plaintiff alleges such harassment. In dicta, the Court stated:

> [W]e do agree with the EEOC that Congress wanted courts to look to agency principles for guidance in this area. While such common-law principles may not be transferable in all their particulars to Title VII, Congress' decision to define "employer" to include any "agent" of an employer, 42 U.S.C. § 2000e(b), surely evinces an intent to place some limits on the acts of employees for which employers under Title VII are to be held responsible. For this reason, we hold that the Court of Appeals erred in concluding that employers are always automatically liable for sexual harassment by their supervisors. See generally Restatement (Second) of Agency §§ 219-237 (1958). For the same reason, absence of notice to an employer does not necessarily insulate that employer from liability.

477 U.S. at 72.

Because the issues raised by plaintiff require us to go beyond Meritor and determine the precise requirements for imposing liability on an employer for hostile work environment sexual harassment, we turn (as directed by the Supreme Court in Meritor ) to principles of basic agency law. Restatement (Second) of Agency § 219 provides that a master is liable for the torts of his servants under the following circumstances:

> (1) A master is subject to liability for the torts of his servants committed while acting in the scope of their employment.
> (2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:
> (a) the master intended the conduct or the consequences, or
> (b) the master was negligent or reckless, or
> (c) the conduct violated a non-delegable duty of the master, or
> (d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.

In our first post- Meritor case involving employer liability for hostile work environment sexual harassment, we identified three of the above-quoted sections as possible bases for employer liability. Hicks , 833 F.2d at 1418. Specifically, we identified (1), (2)(b), and (2)(d) as possible bases. These sections will be discussed in order.

Section 219(1) has been cited by some courts and commentators as a legitimate basis for imposing liability on an employer for a supervisor's hostile work environment harassment (at least in certain circumstances). See Oppenheimer, Exacerbating the Exasperating: Title VII Liability of Employers for Sexual Harassment Committed By Their Supervisors , 81 Cornell L. Rev. 66, 142 (Nov. 1995). However, we have concluded § 219(1) is rarely applicable in hostile work environment cases because "'[s]exual harassment simply is not

-12-

within the job description of any supervisor or any other worker in any reputable business.'" Hicks, 833 F.2d at 1417-18 (quoting Holtzman & Trelz, Recent Developments in the Law of Sexual Harassment: Abusive Environment Claims after Meritor Savings Bank v. Vinson, 31 St. Louis U.L.J. 239, 276 (1987)); see also Staszewski, Using Agency Principles for Guidance in Finding Employer Liability for a Supervisor's Hostile Work Environment Sexual Harassment, 48 Vand. L. Rev. 1057, 1073 (May 1995) (concluding "respondeat superior analysis [under § 219(1)] is a poor vehicle for finding employer liability for a supervisor's hostile work environment sexual harassment").

Section 219(2)(b) imposes liability on an employer for "negligence or recklessness in failing to respond to hostile work environment sexual harassment by employees." Hirschfeld, 916 F.2d at 577. Under this theory of employer liability, the plaintiff must establish "that the employer had actual or constructive knowledge of the hostile work environment," but "did not adequately respond to notice of the harassment." 48 Vand. L. Rev. at 1080. Generally speaking, an employer will not be charged with constructive knowledge of the harassment merely because a supervisor is the perpetrator of the harassment. See Restatement (Second) of Agency § 282(1) (1958).

Section 219(2)(d) contains two separate clauses, each of which can provide a basis for imposing liability on an employer. The first clause provides an employer will be liable if "the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority." To recover, a plaintiff "must show that the employer manifested in [the supervisor] the

-13-

authority to act on its behalf, that such manifestation resulted in harm to the plaintiff, and that the plaintiff acted or relied on the apparent authority in some way." 48 Vand. L. Rev. at 1087. The first element is established "[w]henever an employer vests its supervisor with the authority to control significant aspects of the work environment." Id. at 1089. The second element is satisfied by demonstrating the supervisor subjected plaintiff to sexual harassment. The third element (that plaintiff acted or relied on the apparent authority of her supervisor) is the most difficult to prove and will often hinge upon whether the employer has a formal policy against sexual harassment. Id. "When an employer lacks a formal written grievance policy, a victim of sexual harassment will reasonably perceive her only available options to be silently acquiescing in the harassment or leaving her job." Id. at 1090. In contrast, if an employer has taken steps "to remove any possible inference that a supervisor has authority to sexually harass his subordinates," the victim is likely aware the harassment is not authorized and reliance on apparent authority will be difficult to establish. Id.

The second clause of § 219(2)(d) provides an employer will be liable if the servant "was aided in accomplishing the tort by the existence of the agency relation." Despite the straightforward wording of this clause, there is disagreement over how to interpret and apply it in the context of Title VII sexual harassment cases. Some courts and commentators interpret the clause to mean an employer will be liable if it "delegates the authority to control the work environment to a supervisor who then abuses that delegated authority." 48 Vand. L. Rev. at 1091. This interpretation acknowledges that, "[e]ven if an employer

-14-

successfully negates any apparent authority the supervisor might have had to commit sexual harassment, a supervisor still holds actual power over his subordinates in the workplace." Id. Accordingly, if the supervisor "is able to misuse that power to create a hostile work environment, the employer will be liable for having placed him in the position to do so." Id. In Karibian , the Second Circuit interpreted the second clause of § 219(2)(d) in this manner and held that, "regardless of the absence of notice or the reasonableness of [the employer's] complaint procedures," an employer is liable for a supervisor's hostile work environment harassment if the supervisor was "aided in accomplishing the harassment by the existence of the agency relationship." 14 F.3d at 780. Applying these principles to the facts before it, the court stated:

> The essence of [plaintiff's] hostile work environment claim is that her supervisor capitalized upon his authority over her employment to force her to endure a prolonged, violent and demeaning sexual relationship. If the factfinder accepts [plaintiff's] allegations, [the employer] is liable to [plaintiff] because [the supervisor] abused his delegated authority to create a discriminatorily abusive work environment.

Id.; see also Tomka v. Seiler Corp. , 66 F.3d 1295, 1305 (2d Cir. 1995) (continuing to apply this approach).

Other courts have adopted a narrower view of the second clause of § 219(2)(d). See Gary v. Long , 59 F.3d 1391, 1397 (D.C. Cir.), cert. denied , 116 S.Ct. 569 (1995); see also Bouton v. BMW of North America , 29 F.3d 103, 108 (3d Cir. 1994). In Gary , the court outlined its view of the second clause of § 219(2)(d):

> In a sense, a supervisor is always "aided in accomplishing the tort by the existence of the agency" because his responsibilities provide proximity to, and regular contact with, the victim. As Judge MacKinnon noted some

years ago, however, such a reading of section 219(2)(d) "argue[s] too much."  The commentary to the Restatement suggests that this exception embraces a narrower concept that holds the employer liable only if the tort was "accomplished by an instrumentality, or through conduct associated with the agency status."  Thus a telegraph company may be held liable for a tort committed by a telegraph operator who sends a false telegraph message, as may the undisclosed principal of a store whose manager cheats a customer.  In such cases, "[l]iability is based upon the fact that the agent's position facilitates the consummation of the [tort], in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him."

55 F.3d at 1397 (internal citations omitted).  Based upon this reading of the

second clause of § 219(2)(d), the court concluded:

[A]n employer may not be held liable for a supervisor's hostile work environment harassment if the employer is able to establish that it had adopted policies and implemented measures such that the victimized employee either knew or should have known that the employer did not tolerate such conduct and that she could report it to the employer without fear of adverse consequences. . . .  While a supervisor might purport to act or speak on behalf of the employer, there can be no liability if the victim could not reasonably rely on the supervisor's representations.

Id. at 1398.

The problem we see with the District of Columbia Circuit's interpretation is

that it effectively merges the first and second clauses of § 219(2)(d).  Stated

differently, we believe this reading of the second clause requires a plaintiff to

prove the same factors as under the first clause--that the supervisor was acting

with apparent authority, that the supervisor subjected plaintiff to sexual

harassment, and that she reasonably relied on the supervisor's apparent authority.

In so doing, this reading renders the second clause superfluous.

In our view, the better interpretation is that adopted by the Second Circuit

in Karibian .  Compared with the latter interpretation, the      Karibian  approach is

more consistent with the language of § 219(2)(d), better suited for cases involving sexual harassment, and the most logical extension of our previous opinions discussing employer liability under Title VII for sexual harassment. See Hirschfeld , 916 F.2d at 579 (implying liability under second clause of § 219(2)(d) hinges solely on whether harasser used actual authority "to facilitate his harassment," and not upon whether employer had policy against harassment, or whether harasser acted with apparent authority). As previously described, the Karibian interpretation allows an employer to be held liable, even if a sexual harassment policy is in place and is made known to plaintiff, where the supervisor uses his actual or apparent authority to aid or facilitate his perpetration of the harassment. We emphasize, however, that this interpretation does not allow liability to attach where the harasser's agency relationship merely provided him with proximity to plaintiff. See Hirschfeld , 916 F.2d at 579.

In summary, an employer in this circuit can be held liable under Title VII for hostile work environment sexual harassment committed by one of its supervisors if any of the following conditions are met:

1)      The supervisor committed the harassment while acting in the scope of his employment. See Restatement (Second) of Agency § 219(1). (As previously indicated, this will rarely be a basis for employer liability.)

2)      The employer knew about, or should have known about, the harassment and failed to respond in a reasonable manner. See Restatement (Second) of Agency § 219(2)(b).

3)      If the employer manifested in the supervisor the authority to act on its behalf, such manifestation resulted in harm to the plaintiff, and the plaintiff acted or relied on the apparent authority in some way. See Restatement (Second) of Agency § 219(2)(d), clause 1.

-17-

4)      If the employer delegated the authority to the supervisor to control the plaintiff's work environment and the supervisor abused that delegated authority by using that authority to aid or facilitate his perpetration of the harassment.    See Restatement (Second) of Agency § 219(2)(d), clause 2.

Before examining the challenged jury instructions, one final consideration is the effect of this court's holding in     Sauers v. Salt Lake County  , 1 F.3d 1122 (10th Cir. 1993).  In   Sauers , plaintiff Debra Sauers was terminated as a secretary in the Salt Lake County Attorney's office in early 1988.  Believing she had been the victim of sexual harassment and retaliation, plaintiff initially sought and was denied relief from the Salt Lake County Career Service Council.  On April 7, 1988, plaintiff received a right to sue letter from the EEOC informing her she had 90 days in which to file a discrimination action in federal court.  Eighty-nine days later, on July 5, 1988, plaintiff filed a pro se complaint under Title VII naming her supervisor, Ted Cannon, and the Salt Lake County Attorney's Office as defendants.  After retaining counsel, plaintiff subsequently filed a verified amended complaint on September 29, 1988, naming Salt Lake County and Cannon as defendants. Defendants argued plaintiff's complaint was barred by the statute of limitations because she did not name her employer as a defendant until after the 90-day period for filing suit had expired.  In rejecting this argument, this court noted that "'the proper method for a plaintiff to recover under Title VII is by suing the employer, either by naming the supervisory employees as agents of the employer or by naming the employer directly.'"  1 F.3d at 1125 (quoting       Busby v. City of Orlando  , 931 F.2d 764, 772 (11th Cir. 1991)).  Because plaintiff's pro se complaint had named Cannon as a defendant, and because Cannon could only be

-18-

sued in his official capacity, the court held the complaint "operated as a suit against Salt Lake County itself," and was therefore timely.       Id.  Continuing, the court held:

> The County may be liable without necessarily knowing of Cannon's actions.  "The term 'employer' means a person engaged in an industry affecting commerce . . . and any agent of such a person."  42 U.S.C. § 2000e(b).  Unfortunately, "[n]owhere in Title VII is the term 'agent' defined."  Barger v. Kansas , 630 F. Supp. 88, 89 (D. Kan. 1985).  We agree with the Fourth Circuit that "[a]n individual qualifies as an 'employer' under Title VII if he or she serves in a supervisory position and exercises significant control over the plaintiff's hiring, firing or conditions of employment."  Paroline v. Unisys Corp.  , 879 F.2d 100, 104 (4th Cir. 1989), aff'd in pertinent part  , 900 F.2d 27 (4th Cir. 1990) (en banc).  In such a situation, the individual operates as the alter ego of the employer and the employer is liable for the unlawful employment practices of the individual without regard to whether the employer knew of the individual's conduct.  See 29 C.F.R. § 1604.11(c).

Id.  In a footnote to the above-quoted paragraph, the court further stated:

> The employer is not always liable for sexual harassment by its supervisors,  Meritor Savings v. Vinson  , 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986), but may be liable under the agency principles discussed in   Hirschfeld v. New Mexico Corrections Department   , 916 F.2d 572 (10th Cir. 1990).  There we determined that employer liability for sexual harassment may attach if the harassers were acting within the scope of their employment, if the employer failed to remedy a hostile environment of which it knew or should have known, or if the harassers acted under apparent authority from the employer or were aided in accomplishing the harassment by their relationship to the employer.

Id. n. 3.

The central question posed by the above-quoted language is whether, as the district court in this case apparently concluded, it imposes an additional requirement that must be met before an employer can be held liable under Title VII for hostile work environment sexual harassment.  Specifically, the question is whether a plaintiff must (before establishing employer liability under §§ 219(1),

(2)(b), or (2)(d)) demonstrate the individual harasser is an "agent" as defined in Sauers : i.e., that the harasser "'serve[d] in a supervisory position and exercise[d] significant control over the plaintiff's hiring, firing or conditions of employment." 1 F.3d at 1125. For the following reasons, we conclude Sauers should not be interpreted as imposing such a requirement.

First, the above-quoted language from Sauers arose solely in the context of deciding whether the employer (Salt Lake County) had been timely sued. Thus, the "requirement" that the harasser "serve[] in a supervisory position and exercise[] significant control over the plaintiff's hiring, firing or conditions of employment," applies only when deciding whether the filing of a suit against a harasser (in his official capacity) can operate as a suit against the employer.

Second, there is nothing in the language of Title VII or Restatement of Agency that limits the liability of an employer to harassment perpetrated by an employee who "serve[d] in a supervisory position and exercise[d] significant control over the plaintiff's hiring, firing or conditions of employment." Notably, we have never imposed such requirements in any of our post- Meritor , pre- Sauers opinions (i.e., Hicks and Hirschfeld ). As Sauers itself acknowledges, the question of employer liability for the conduct of its employees is determined according to the agency principles referred to in Meritor and fleshed out in Hirschfeld .

Third, application of the Sauers definition of "agent," taken to its extreme, would have the illogical result of shielding employers from liability for harassment committed by low-level employees. In particular, under the Sauers definition, an employer would never be liable for harassment committed by low-

-20-

level supervisors (or any employees who commit peer harassment) because the harasser would not meet the _Sauers_ definition of "agent."  Clearly, this was not the result intended by Title VII, _Meritor_, _Hicks_, or _Hirschfeld_.

For all of these reasons, we conclude the discussion in _Sauers_ of who constitutes an "agent" for Title VII purposes is strictly limited to situations in which a court is determining whether a claim against a named individual defendant (in his official capacity) can operate as a claim against the employer itself.  Where, as here, plaintiff has properly sought Title VII relief directly against her employer, the "agent" definition in _Sauers_ simply has no applicability in deciding whether the employer is liable for the conduct of its employees.

We now turn to the challenged jury instructions.

*Significant managerial control and apparent authority to commit sexual harassment*

Over the objection of plaintiff, the district court instructed the jury as follows regarding Potash's liability under Title VII:

DETERMINATION OF PLAINTIFF'S CLAIM
AS TO DEFENDANT EDDY POTASH, INC.
CIVIL RIGHTS ACTS
If you determine that plaintiff, Jeanne Harrison, has established her prima facie claim of sexual harassment creating a hostile work environment, then you shall proceed to determine whether plaintiff has established her claim of liability as against the defendant Eddy Potash, Inc.
In order for plaintiff to establish her claim of liability against defendant Eddy Potash, Inc., plaintiff must prove each of the following three elements by a preponderance of the evidence.
FIRST:     That the Defendant Robert Brown was the agent of defendant Eddy Potash, Inc.;
SECOND:    That the defendant Robert Brown was acting under the apparent authority of Eddy Potash, Inc. in the

-21-

commission of the acts in question; and

THIRD:    That the plaintiff reasonably relied upon such apparent authority.

Append. III at 449-50.  The district court further instructed the jury as follows:

AGENCY RELATIONSHIP -- DEFINED

In order for you to hold the defendant Eddy Potash, Inc. liable to the plaintiff Jeanne Harrison for the acts of Robert Brown, you must find that Robert Brown was an agent of defendant Eddy Potash, Inc.  In order to determine whether Robert Brown was an agent of defendant Eddy Potash, Inc., you must find that Robert Brown exercised significant control over plaintiff's hiring, firing or conditions of employment at Eddy Potash, Inc., such that Robert Brown's supervisory position was equivalent to that of managerial control over plaintiff, thereby creating an employer/employee relationship, thus making Robert Brown the alter ego of Eddy Potash, Inc.

Id. at 451.  Plaintiff contends these instructions were erroneous because they improperly combined two discrete bases for employer liability under Title VII by instructing the jury that Potash would be liable only if Brown had significant managerial control over plaintiff and if Brown had apparent authority to commit the sexual harassment.  According to plaintiff, satisfaction of either one of these requirements is sufficient to impose Title VII liability on Potash.  Plaintiff also argues Brown had actual authority to control the conditions of her employment, and this alone would have provided a basis for employer liability had the jury been properly instructed.

Although we do not accept all of plaintiff's arguments, it is without question that the above-quoted instructions failed to properly state the law.  The first instruction, which purported to set forth the essential elements for imposing liability on Potash, was incomplete because it only informed the jury about the basis for liability provided in the first clause of § 219(2)(d) (i.e., apparent authority), and ignored the basis for employer liability provided in the second

-22-

clause of § 219(2)(d) (as noted in greater detail below, plaintiff requested an instruction on the second clause of § 219(2)(d)).  Further, because it was uncontroverted that Brown was an employee of Potash, it is questionable whether the instruction should have required plaintiff to demonstrate that Brown was an agent of Potash.  Finally, and most significantly, the second instruction, which purported to define the term "agent," was obviously derived from      Sauers  and is incorrect.  For the reasons outlined above in the general discussion of employer liability under Title VII, the      Sauers  definition of "agent" should be used only in deciding whether a suit against an individual employee can operate as a suit against the employer itself.  It is not an additional requirement that a Title VII plaintiff must satisfy in order to impose liability on his or her employer.  If there was a genuine issue of fact concerning whether Brown was an agent of Potash, then a more general definition of "agent," derived from Restatement (Second) of Agency, should have been used.

Reviewing the challenged instructions in light of the record on appeal, we have no doubt that the instructions were prejudicial to plaintiff.  Although the evidence introduced at trial indicated Brown had authority to control significant aspects of plaintiff's day-to-day employment, it is without question he was not a member of top-level management.  Because the court's "agent" instruction effectively required plaintiff to demonstrate Brown was the "alter ego" of Potash, i.e., a member of top-level management, the instruction effectively prevented her from demonstrating liability on the part of Potash.  In addition, the court refused to instruct the jury on the theory of liability provided by the second clause of §

-23-

219(2)(d). In light of the evidence introduced at trial, this was clearly a viable basis for imposing liability on Potash.

*Defining apparent authority*

At trial, the district court instructed the jury on the meaning of "apparent authority":

> APPARENT AUTHORITY -- DEFINED
> If you find that Robert Brown was an agent of Eddy Potash, Inc. then you must also determine whether Robert Brown was acting with "apparent authority" as an agent of Eddy Potash, Inc.
> In this regard you are instructed that an employer, such as Eddy Potash, Inc., may not be liable to an employee for the acts of its agent (supervisor) unless its agent had "authority," whether apparent or otherwise, to commit the acts in question.
> In order to determine whether an agent had "apparent authority" you should consider what knowledge the plaintiff had regarding the authority of the agent to commit such acts in question. In this regard you should consider whether the employer had established by a preponderance of the evidence that it had adopted policies against sexual harassment, and had implemented measures such that a victimized employee knew or should have known that the employer did not tolerate such conduct and that she could report it to her employer without fear of adverse consequences.

Append. III at 452-53.

On appeal, plaintiff argues "apparent authority" is a confusing technical term that was not adequately explained to the jury by the district court's instruction. Plaintiff further argues the instruction confused actual and apparent authority by telling the jury they should "consider what knowledge the plaintiff had regarding the authority of the agent to commit such acts in question." According to plaintiff, this language directed the jury to examine plaintiff's knowledge concerning Brown's actual authority to assault her. At the very least, plaintiff argues, this language was confusing and did not properly guide the jury

-24-

in its deliberations. Finally, plaintiff argues the instruction could be construed to mean the existence of a policy against sexual harassment is a complete defense for the employer, which, according to plaintiff, is not an accurate statement of Tenth Circuit law.

We conclude the instruction is flawed in two major respects. First, and most significantly, the instruction informed the jury that Potash could be liable for the acts of Brown only if Brown had authority, apparent or otherwise, to harass plaintiff. This is simply not an accurate statement of the law. Although apparent authority to harass is a necessary requirement for imposing liability on an employer under the first clause of § 219(2)(d), no such authority is needed to establish liability under the second clause of § 219(2)(d). Rather, the fact that the supervisor has actual or apparent authority to control the victim's working environment, and is aided in harassing the victim by that authority, is sufficient to establish employer liability under the second clause of § 219(2)(d).

Second, the instruction did not provide the jury with an accurate definition of the term "apparent authority." Restatement (Second) of Agency § 27 indicates apparent authority "to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." In the comment to that section, it is further noted "there is the basic requirement that the principal be responsible for the information which comes to the mind of the third person." Accordingly, the comment provides that "the principal must intend to cause the

-25-

third person to believe that the agent is authorized to act for him, or he should realize that his conduct is likely to create such belief."      Id.  Here, the challenged instruction wholly failed to inform the jury that any "apparent authority" on the part of Brown would have been created by the "written or spoken words or any other conduct" of Potash.  Instead, the jury was led to believe the sole focus of apparent authority was the "knowledge" of plaintiff.  The references to plaintiff's "knowledge" should have been deleted; instead, the instruction should have referred to what plaintiff reasonably "believed" based upon the employer's words or conduct.

Although plaintiff complains about the last sentence of the instruction (which discussed whether Potash had implemented a sexual harassment policy), we find nothing wrong with it.  As noted in the general discussion of employer liability, if an employer has taken steps "to remove any possible inference that a supervisor has authority to sexually harass his subordinates," 48 Vand. L. Rev. at 1087, the victim is likely aware the harassment is not authorized, and reliance on apparent authority will be difficult to establish.  Accordingly, the question of whether the employer established and implemented a policy against sexual harassment is an important factor in deciding whether apparent authority existed.

Viewing the instructions as a whole, we conclude the flaws in the apparent authority instruction were prejudicial to plaintiff.  Although it was uncontroverted that Potash had in place a policy against sexual harassment, there were genuine questions of material fact concerning whether plaintiff had prior knowledge of this policy.  Thus, there was at least some basis upon which the jury could have

-26-

concluded, had they been properly instructed, that Brown had apparent authority to commit the harassment. Moreover, the challenged instruction incorrectly informed the jury that Potash could be liable only if Brown had actual or apparent authority to commit the harassment. Under the second clause of § 219(2)(d), no such authority was necessary.

*Employer liability*

At trial, plaintiff submitted the following three proposed instructions concerning Potash's liability for the actions of Brown:

> PLAINTIFF'S REQUESTED INSTRUCTION NO. 7
> An employer may be held liable for wrongdoing committed by the employer's supervisory employees if certain requirements are met. If you find that Robert L. Brown is liable to Jeanne Harrison, you must decide whether Eddy Potash, Inc. is liable for his wrongdoing.
> Eddy Potash, Inc. would be liable if you find by a preponderance of the evidence that one of the following circumstances is true:
> First, Eddy Potash would be liable if Robert L. Brown were aided in accomplishing his wrongdoing by the fact that he was an agent of Eddy Potash. That is, Eddy Potash would be liable if the fact that Robert L. Brown was a shift foreman for Eddy Potash helped him to engage in wrongful conduct concerning Jeanne Harrison.
> Second, Eddy Potash would be liable if Robert L. Brown had significant supervisory authority over Jeanne Harrison. "Significant supervisory authority" means the authority to hire, fire, discipline, or promote, or at least to participate in or recommend such actions, or the ability to control the conditions of a person's employment.
> Eddy Potash can be liable even though what Mr. Brown did violated company policy and even though it took prompt action after it learned of the sexual harassment.

> PLAINTIFF'S REQUESTED INSTRUCTION NO. 24
> Under 42 U.S.C. § 2000e, an employer is liable for the tort of an employee if the employee was aided in accomplishing the tort by the existence of the agency relation.

PLAINTIFF'S REQUESTED INSTRUCTION NO. 25
An employer is liable under Title VII where the action complained of was that of a supervisor, authorized to hire, fire, discipline or promote, or at least to participate in or recommend such actions, even though what the supervisor is said to have done violates company policy.

Append. I at 47-50. The three instructions were rejected by the district court.

On appeal, plaintiff contends the district court abused its discretion in refusing to give the requested instructions. First, relying on the definition of "agent" set forth in Sauers, plaintiff contends her proposed instructions 7 and 25 correctly tracked the law in this circuit and provided that Potash would be liable if Brown had the authority to hire, fire, discipline, or promote employees, or at least to participate in such actions. Second, relying on the second clause of § 219(2)(d), and citing Hicks and Hirschfeld, plaintiff contends proposed instructions 7 and 24 correctly stated the law and provided that Potash would be liable for Brown's harassing conduct if he was aided in accomplishing the harassment by the existence of the agency relation.

Plaintiff's first argument is without merit. For the reasons previously addressed, the definition of "agent" in Sauers should be used only for purposes of determining whether a suit against an individual employee can operate as a suit against the employer. It should not be construed as a requirement plaintiffs must satisfy in order to establish liability on the part of employers. Nor can it be construed (as argued by plaintiff) as setting forth an independent basis for imposing liability on an employer under Title VII for the actions of a supervisor. As the Supreme Court specifically emphasized in Meritor, and as this court has since acknowledged, an employer is not strictly liable for hostile work

-28-

environment sexual harassment committed by one if its supervisors. Plaintiff's proposed interpretation of Sauers would produce such a result.

Plaintiff's second argument has greater merit. For the reasons outlined in the general discussion of employer liability, the district court should have given the jury some type of instruction concerning the second clause of § 219(2)(d). Because the court refused altogether to instruct the jury on the second clause, it abused its discretion.

For the reasons set forth, we conclude the district court's jury instructions on employer liability were erroneous and prejudicial to plaintiff. In addition, we conclude the district court abused its discretion in refusing to instruct the jury on the basis for employer liability provided in the second clause of § 219(2)(d). Accordingly, the judgment in favor of Potash and against plaintiff on her Title VII claim is reversed, and the case is remanded to the district court for further proceedings.

III.
*Cross-Appeal*

During the period of plaintiff's employment, Potash allegedly operated under a Collective Bargaining Agreement (CBA) with Steelworkers Union, Local #177, of which plaintiff was a member. According to Potash, the CBA contained a grievance procedure which plaintiff should have invoked prior to filing suit against Potash. Because plaintiff failed to do so, Potash argues she is barred from

pursuing her Title VII claim in federal court. [3]

The seminal decision concerning the "proper relationship between federal courts and the grievance-arbitration machinery of collective-bargaining agreements in the resolution and enforcement of an individual's rights to equal employment opportunities under Title VII" is <u>Alexander v. Gardner-Denver Co.</u>, 415 U.S. 36, 38 (1974). Harrell Alexander was a black, union-represented employee who had been fired by Gardner-Denver for allegedly producing too many defective or unusable parts. Claiming his discharge was racially motivated, Alexander filed a grievance alleging a violation of the nondiscrimination clause in the collective bargaining agreement between his union and Gardner-Denver. Following the arbitration hearing, the arbitrator denied the grievance without addressing the racial discrimination claim. Alexander then filed a Title VII action in federal district court based upon the same facts alleged in his grievance. Gardner-Denver moved to dismiss Alexander's complaint on the grounds of election of remedies and waiver. The district court, later affirmed by the court of appeals, granted summary judgment to Gardner-Denver on the ground that Alexander was bound by the prior adverse decision of the arbitrator. The Supreme Court reversed, concluding Alexander's statutory right to trial under Title VII was not foreclosed by his earlier submission of a discrimination claim to

---

[3] Potash presented this argument to the district court through a motion to dismiss and for summary judgment. Append. I at 37. Although the court apparently rejected this argument, Potash failed to include a copy of the court's order in the record on appeal. Further, Potash failed to include a copy of the CBA in the record on appeal.

-30-

arbitration. "The [ Gardner-Denver ] Court found that in enacting Title VII, Congress had granted individual employees a nonwaivable public law right to equal employment opportunities that was separate and distinct from the rights created through the 'majoritarian processes' of collective bargaining." Barrentine v. Arkansas-Best Freight System , 450 U.S. 728, 737-38 (1981). In addition, "because Congress had granted aggrieved employees access to the courts, and because contractual grievances and arbitration procedures provided an inadequate forum for enforcement of Title VII rights, the Court concluded that Title VII claims should be resolved by the courts de novo." Id. at 738.

Seventeen years later, the Court issued its opinion in Gilmer v. Interstate/Johnson Lane Corp. , 500 U.S. 20 (1991). Robert Gilmer was hired by defendant as a manager of financial services. As a condition of his employment, Gilmer was required to register as a securities representative with several stock exchanges, including the New York Stock Exchange (NYSE). The NYSE registration application included a provision by which Gilmer agreed to arbitrate any claim which arose between him and defendant and which was required to be arbitrated under exchange rules. NYSE Rule 347 provided for arbitration of any controversy between a registered representative and a member organization arising out of the representative's termination of employment. Defendant terminated Gilmer's employment in 1987; at the time, Gilmer was 62 years of age. After filing a charge of discrimination with the EEOC, Gilmer filed suit against defendant in federal court alleging violations of the Age Discrimination in Employment Act (ADEA). Defendant moved to compel arbitration of Gilmer's

claim and the district court, citing <u>Alexander</u>, denied the motion. On appeal, the

Fourth Circuit reversed. The Supreme Court then granted certiorari "to resolve a

conflict among the Courts of Appeals regarding the arbitrability of ADEA

claims." 500 U.S. at 24.

Relying on the Federal Arbitration Act (FAA), 9 U.S.C. § 1 et seq., the

Supreme Court held that Gilmer was obligated to arbitrate his claim that his

discharge violated the ADEA. In so holding, the Court rejected Gilmer's

arguments that compulsory arbitration of ADEA claims was inconsistent with the

statutory framework and purposes of the ADEA, that arbitration would undermine

the role of the EEOC in enforcing the ADEA, and that compulsory arbitration

deprived claimants of the judicial forum provided by the ADEA. Further, the

Court rejected various challenges raised by Gilmer to the adequacy of arbitration

procedures. The Court rejected Gilmer's reliance on <u>Alexander</u>, specifically

concluding <u>Alexander</u> and its progeny were factually distinguishable from

Gilmer's situation:

> First, those cases did not involve the issue of the enforceability of an
> agreement to arbitrate statutory claims. Rather, they involved the quite
> different issue whether arbitration of contract-based claims precluded
> subsequent judicial resolution of statutory claims. Since the employees
> there had not agreed to arbitrate their statutory claims, and the labor
> arbitrators were not authorized to resolve such claims, the arbitration in
> those cases understandably was held not to preclude subsequent statutory
> actions. Second, because the arbitration in those cases occurred in the
> context of a collective-bargaining agreement, the claimants there were
> represented by their unions in the arbitration proceedings. An important
> concern therefore was the tension between collective representation and
> individual statutory rights, a concern not applicable to the present case.
> Finally, those cases were not decided under the FAA, which, as discussed
> above, reflects a "liberal federal policy favoring arbitration agreements."
> Therefore, those cases provide no basis for refusing to enforce Gilmer's
> agreement to arbitrate his ADEA claim.

Id. at 35 (internal citation omitted).

Since Gilmer, employer/defendants have argued that Gilmer effectively overruled Alexander and now requires plaintiffs to comply with a collective bargaining agreement's grievance and arbitration procedures prior to filing suit in federal court. To date, only the Fourth Circuit has accepted this argument, Austin v. Owens-Brockway Glass Container, 78 F.3d 875 (4th Cir.) (affirming grant of summary judgment to employer because plaintiff failed to submit Title VII and ADA claims to mandatory arbitration under collective bargaining agreement), cert. denied, 117 S.Ct. 432 (1996), while the majority view is that Alexander and its progeny "remain good law and that statutory employment claims are independent of a collective bargaining agreement's grievance and arbitration procedures." Malin, Arbitrating Statutory Employment Claims in the Aftermath of Gilmer, 40 St. Louis U.L.J. 77, 84 (1996); see, e.g., Varner v. National Super Markets, 94 F.3d 1209, 1213 (8th Cir. 1996) (holding employee not required to exhaust grievance and arbitration remedies under collective bargaining agreement before bringing suit under Title VII), cert. denied, 117 S.Ct. 946 (1997); Tran v. Tran, 54 F.3d 115, 117 (2d Cir. 1995) ("There is nothing in Gilmer which appears to throw anything but favorable light upon the continuing authority of [ Alexander and its progeny]."), cert. denied, 116 S.Ct. 1417 (1996); Bintner v. Burlington Northern, 857 F. Supp. 1484, 1488 (D.Wyo. 1994) ("There is nothing in Gilmer to suggest that the Court abandoned or even reconsidered its efforts to protect individual statutory rights from the give-and-take of the collective-bargaining process."). Although the Tenth Circuit has interpreted Gilmer as authorizing

compulsory arbitration of Title VII claims, Metz v. Merrill Lynch, Pierce, Fenner & Smith, 39 F.3d 1482, 1487 (10th Cir. 1994) (plaintiff completed securities registration application which contained compulsory arbitration clause), it has never addressed the precise question at issue here (i.e., whether a Title VII plaintiff must comply with a grievance procedure outlined in union's collective bargaining agreement prior to filing suit in federal court against employer).

For the following reasons, we adopt the majority view. The context in which an arbitration clause arises cannot be ignored. In Alexander, the clause was contained in a collective bargaining agreement; in Gilmer, it was contained in an individual application for registration as a securities dealer. "Nothing in Gilmer suggests that the Court abandoned its concern about the inherent conflicts between group goals and individual rights that exist in the give-and-take of the collective bargaining process." Randolph v. Cooper Industries, 879 F. Supp. 518, 521 (W.D.Pa. 1994). Although plaintiffs like the one in Gilmer at least have "the theoretical possibility of negotiating a separate deal with their employers" that does not require arbitration, unionized employees have no such choice. 40 St. Louis. U.L.J. at 87. "Any separate deal [they] might negotiate would be void because the union is [their] exclusive bargaining representative." Id. "Consequently, . . . the union is restricted to waiving collective rights." Id.

An arbitration clause in a collective bargaining agreement (at least historically) implicates only contractual rights under that agreement. Alexander, 415 U.S. at 49. Thus, by submitting a grievance, a union employee "seeks to vindicate his contractual right[s]" under the collective bargaining agreement, but

-34-

does not assert his "independent statutory rights accorded by Congress." Id. at 49-50.  In contrast, the arbitration clause at issue in Gilmer encompassed the employee's statutory rights. [4]  500 U.S. at 23.

There are significant differences between labor arbitration and commercial arbitration.  In labor arbitration, the arbitrator is "the proctor of the bargain," and his "task is to effectuate the intent of the parties." Alexander , 415 U.S. at 53. Consequently, "[h]is source of authority is the collective bargaining agreement," and he "has no general authority to invoke public laws that conflict with the bargain between the parties." Id.  In short, he "is confined to a system of private law, totally outside the system of public law of which employment statutes are a part."  40 St. Louis U.L.J. at 87-88.  "In contrast, the employment arbitrator [in commercial arbitration], as envisioned in Gilmer , provides a forum for the vindication of public law rights." Id. at 88.

Finally, we question whether Gilmer can be applied where, as here, the arbitration clause at issue is not encompassed by the FAA.  Section 1 of the FAA specifically excludes from the FAA's reach "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce."  9 U.S.C. § 1.  We have previously concluded this language encompasses collective bargaining agreements, and have thus held the FAA "is generally inapplicable to labor arbitration." United Food & Commercial Workers,

---

[4]  Here, we do not have access to the CBA between Potash and plaintiff's union and therefore do not know what the arbitration clause encompasses. However, there is no indication in Potash's appellate brief that plaintiff's union agreed to arbitrate its members' statutory claims (e.g., Title VII claims).

Local Union 7R v. Safeway Stores, 889 F.2d 940, 944 (10th Cir. 1989). Because the arbitration clause at issue in Gilmer was not contained in a collective bargaining agreement, the Court was free to rely on the FAA for support. Here, in contrast, the arbitration clause at issue is contained in a collective bargaining agreement that is not covered by the FAA. Thus, Alexander provides the better reasoned authority for this situation. See Turner, Compulsory Arbitration of Employment Discrimination Claims with Special Reference to the Three A's-- Access, Adjudication, and Acceptability, 31 Wake Forest L. Rev. 231, 262 (1996) (discussing FAA exemption issue).

In conclusion, we reject Potash's cross-appeal, and refuse to require plaintiff to exhaust the grievance procedures provided in the CBA.

IV.

With respect to plaintiff's appeal (No. 96-2045), we REVERSE the judgment of the district court and REMAND for further proceedings consistent with this order. With respect to defendant Potash's cross-appeal (No. 96-2065), we AFFIRM the judgment of the district court.