Lillian **RUBIDOUX**, et al., Plaintiffs,

v.

**COLORADO MENTAL HEALTH INSTITUTE OF PUEBLO and the State of Colorado, Defendants.**

**Civil Action No. 94–WM–202.**

United States District Court, D. Colorado.

Sept. 10, 1997.

---

1382

J.E. Losavio, Jr., Michael L. Garcia, Max Wilson, Charles P. Malone, Law Offices of J.E. Losavio, Jr., Pueblo, CO.

Douglas Cox, Beverly Fulton, Asst. Atty. Gen., Denver, CO.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

MILLER, District Judge.

Plaintiffs, employees of the Defendant Colorado Mental Health Institute of Pueblo ("CMHIP"), sued Defendant for both *quid pro quo* and hostile work environment sexual harassment, as well as for unlawful retaliation. Those claims survived Defendants' Motion for Summary Judgment in accordance with my Order, dated February 24, 1997. All other Defendants were dismissed.

As I have previously ruled, this court has jurisdiction pursuant to 42 U.S.C. § 2000e–5(f)(3). Following a one-week trial and the submission of arguments of the parties, I make the following factual findings and conclusions of law pursuant to Rule 52(a), Fed. R.Civ.P.

### FINDINGS OF FACT

#### *Generally*

1. Defendant CMHIP, formerly known as the Colorado State Hospital, is a state-operated treatment facility that provides medical and psychiatric care for patients, including children and adolescents who are committed to, and treated at, the facility on a residential basis.

2. The Child and Adolescent Treatment Center ("CATC") of Defendant's facility was composed of five residential units, known as Cottage A, Cottage B, etc. The cottages were clustered near a school building at which the children and adolescents attended classes.

3. Each cottage was managed by a lead nurse and a team leader in the supervisory roles. Another nurse served as shift coordinator.

4. Plaintiff Rubidoux was hired by Defendant in October 1989 at an entry-level registered nursing position known as "Nurse IA" and assigned to Cottage A where she remained until reassigned to Cottage B in 1994. She remains employed by the Defendant.

5. Plaintiff Wisthoff was hired in May 1991 as a psychiatric technician on a probationary status and assigned to Cottage A as

well. She remained in Cottage A until it was closed. She too remains employed by Defendant.

6. Leonard Jiminez, a long-time employee of Defendant, was the lead nurse in Cottage A from the time Plaintiffs were hired until he was placed on administrative leave in September 1992 (and ultimately terminated). As such, he was Plaintiffs' direct supervisor from the time they were hired until his suspension.

7. For the following reasons, I find that Mr. Jiminez wielded sufficient power with actual or apparent authority to adversely affect the terms and conditions of Plaintiffs' employment:

a. He was the representative of Defendant who interviewed both Plaintiffs for their jobs and recommended that they be hired, although he did not have the ultimate hiring authority within the state personnel system. Mr. Jiminez was perceived by Plaintiffs and others, including the defense witness nurse LaDean Silberhorn, as the individual who made the hiring decision. The actual "appointing authority," division director Dr. Kailish Jaitly, testified that it was quite possible he approved the Plaintiffs' hire solely on the basis of Mr. Jiminez's recommendation.

b. He had direct control over the working environment.

c. He had the authority to conduct annual performance reviews and to make recommendations for advancement for both Plaintiffs.

d. Although he did not have authority to take formal adverse action concerning pay, seniority, etc., he did have the ability to initiate a hearing process if he took exception to an employee's performance.

e. He was in charge of granting leave and setting schedules in Cottage A.

8. Jiminez used that actual or apparent authority to sexually harass the Plaintiffs as set forth below.

9. At all times relevant to this action, CMHIP had a-sexual-harassment policy of which Plaintiffs knew but did not use to seek relief from Jiminez's acts.

*Sexual Harassment—Plaintiff Rubidoux*

10. Jiminez was described as having a significant physical presence, being heavy set, somewhat less than medium height, but over 200 pounds.

11. Within the first few weeks of her employment in the early fall of 1989, Jiminez invited Plaintiff Rubidoux for an after-work drink, supposedly to review her performance. Instead, Rubidoux recalls Jiminez being much more personal. He declared her to be attractive, asked about the clothing she wore and hugged her as they left.

12. At a 1989 Christmas party in Jiminez's home, he was overly friendly, taking Plaintiff to the coat room, hugging and holding her close to him.

13. During work hours a pattern evolved. Jiminez commonly touched Plaintiff Rubidoux on her hands and legs, often pulled her close to him, rubbed himself against her and cupped her breast.

14. Matters worsened. Jiminez once asked Plaintiff to come with him to the basement, allegedly for a job-related purpose, where he grabbed her face with both hands and forcefully kissed her.

15. Another time, Jiminez pointed to the examination room for physicals and joked about giving Plaintiff Rubidoux a pelvic exam. He suddenly grabbed her, pushed her against the examination table, and forcefully kissed her. When she resisted, Jiminez became even more forceful, reaching under her clothes. Just as Plaintiff feared he would become more aggressive, Jiminez suddenly let go and apologized for his activities.

16. Later, Jiminez's treatment of Plaintiff went from being sexually aggressive to demeaning. He made her the butt of tasteless sexual jokes in front of other people, objected to her traditional Spanish pronunciation of his name (Plaintiff Rubidoux is of self-proclaimed Mexican–Apache–American heri-

**1384**

tage), demanded that she learn to speak English, and called her a "pendeja" (stupid women). Jiminez also declared that Plaintiff needed to attend "obedience school."

17. After twenty or more months of employment, Plaintiff finally asked Jiminez about her promotion from Nurse IA status to Nurse IB, a step which traditionally took one year. Jiminez asked her "what's in it for me" if he got Plaintiff promoted (she was ultimately promoted after 22 months).

18. Plaintiff acknowledged that she did not report the incidents until much later, explaining that she felt too embarrassed.

19. Defendant did not directly contest Plaintiff's evidence of harassment, choosing instead to emphasize that the Plaintiff had been publicly supportive of Jiminez for awards, and that the Plaintiff had participated in a common practice of off-colored jokes among the employees and the use of occasional obscene language. There was some testimony that Plaintiff made suggestive comments or engaged in suggestive actions. However, that evidence does not impeach the uncontradicted testimony of Plaintiff Rubidoux and other witnesses of the harassment, nor would such conduct by the Plaintiff have justified the acts of harassment by Jiminez.

*Sexual Harassment—Plaintiff Wisthoff*

20. Plaintiff Wisthoff's unrebutted-testimony establishes that, after she was hired as a probationary employee, Jiminez told her she could be "fired for anything."

21. Within a month of being hired, Jiminez asked Plaintiff Wisthoff to remain after a meeting when other employees had left the room. After conversing for several minutes, he suddenly forcefully grabbed and kissed her face. The Plaintiff was able to repel his embrace. Jiminez told her that he only intended it as a friendly gesture, and that she was over-reacting. As a result, she did not report it.

22. Thereafter, the unrebutted testimony is that Mr. Jiminez began to casually touch Plaintiff Wisthoff at work. Initially this involved placing an arm around her shoulders and hugging her, which she did not find aggressive or offensive. However, over time this progressed to Mr. Jiminez sliding his hand down her buttocks, squeezing them, and eventually touching her breast outside her clothing. Although she found this contact offensive and resisted it, she made no report because she remained a probationary employee and feared Mr. Jiminez had the ability to terminate her.

23. There is a dispute whether Plaintiff Wisthoff told a shift coordinator, Connie Huskins, of Jiminez's actions.

24. Mr. Jiminez escalated his conduct. Once he asked her to go to an isolated portion of Cottage A where he approached Plaintiff Wisthoff from behind and slid his hand inside her shirt. The Plaintiff reacted, Jiminez released her and left the room laughing.

25. Thereafter, Plaintiff Wisthoff was separated from her husband and Jiminez asked her to come to his office to discuss problems she may have been having. Once there, Mr. Jiminez again forcefully pulled her to him, squeezing her breast. The Plaintiff reacted hitting Jiminez while he laughed and kissed her. He finally released her when she yelled.

26. Plaintiff Wisthoff did not report these later events because she was embarrassed and humiliated.

*Sexual Harassment of Others*

27. Diana Vigil, who was hired in May 1987, to work in Cottage A, suffered remarkably similar experiences. Again, she was interviewed by Jiminez in the hiring process, and he became her supervisor who exercised tight control.

28. In May 1989, Mrs. Vigil was asked by Jiminez to come into an office in Cottage A on the pretext of discussing some matter. Once inside the office, Jiminez grabbed Vigil's face with both hands and forcefully kissed

her on the mouth. Mrs. Vigil was frightened and immediately left the office.

29. She advised her shift coordinator, Connie Thomas, whose only response was that Jiminez would not do such a thing. Mrs. Vigil never heard a response from any person with authority.

30. After other kissing instances, matters again got worse. When sitting next to Mrs. Vigil in an office, Jiminez slid his hand up her leg. She slapped his hand away and walked out of the office. Not long thereafter (August 1992), Mrs. Vigil was grabbed by Jiminez, and he squeezed her breast. Again she pulled away and left.

31. Except as hereafter noted, Mrs. Vigil did not report those incidents. She stated that due to the lack of response from the first complaint she was fearful of Jiminez's retaliation.

32. There was testimony by other women concerning sexual propositions and perhaps improper touching by Jiminez, but those events occurred in the early 80s, were not reported to supervisors or other management personnel and are too remote in time to be relevant for consideration now.

33. Mike Maselli, a long-time employee of CMHIP, was the clinical administrator or team leader for Cottage A. In March 1992, he observed Jiminez and other members of the staff engaging in inappropriate sexual banter at a staff meeting. Mr. Maselli counseled Jiminez that the activity was inappropriate and needed to be stopped.

34. Several witnesses established that sexual banter and jokes were commonplace in Cottage A and several of the staff, including Plaintiffs and Jiminez, willingly participated.

### Termination of Jiminez

35. In late September 1992, Diana Vigil was discussing with a fellow employee what sexual harassment involved. She used her own experiences as a "hypothetical example" to see if it was sexual harassment. The

fellow employee took her seriously and encouraged her to make an official report with CMHIP's Department of Public Safety, which she ultimately did on September 27, 1992.

36. When the report came in, Mr. Jiminez was immediately suspended (September 28, 1992) and placed on administrative leave while an investigation was made. Following the conclusion of the investigation, he was terminated, and his termination was upheld by a state administrative law judge on appeal.

37. The Plaintiffs and several other female employees were asked and did provide statements detailing Jiminez's harassment of them.

38. Mrs. Vigil's report was the only instance in which CMHIP had official notice of Jiminez's sexual harassment of his subordinates. I also find that CMHIP did not have any implied notice prior to that time as there is no evidence that management personnel were aware of Jiminez's proclivities before Mrs. Vigil made her official complaint. (The only possible notice was the complaints or comments to Connie Thomas and Connie Huskins, shift coordinators. However, shift coordinators have no authority over hiring, firing, promotion or other conditions of employment and, therefore, are not management level employees.)

39. Plaintiffs and Mrs. Vigil were not aware of each other's experiences with Jiminez until the investigation of Mrs. Vigil's complaint was initiated.

### Allegations of Retaliation

40. Both Plaintiffs filed sexual harassment claims with the Equal Employment Opportunity Commission ("EEOC"), but did not make any claim of retaliation until filing this suit because all alleged acts of retaliation did not occur until after the EEOC charges were made.

41. Jiminez had several strong supporters within Cottage A and it is unrebutted

**1386**

that, after his termination, there was some tension in Cottage A between Jiminez supporters and the Plaintiffs and their supporters.

42. Plaintiffs claim that CMHIP's division director, Dr. Kailish Jaitly, distributed the Plaintiffs' incident statements to the staff of Cottage A in retaliation for filing their complaints. I find from the evidence that those statements were given only to appropriate management personnel and not distributed to the general staff of Cottage A.

43. Plaintiff Rubidoux claims retaliation from the failure to promote her to a Nurse II position, but the evidence is unrebutted that she did not score sufficiently high on the required examination to be considered for such promotion.

44. Plaintiff Rubidoux makes a curious retaliation claim that she was told not to speak to co-workers about the events surrounding Jiminez's termination. There is a serious question whether this is an adverse employment action. Regardless, the unrebutted testimony of the Defendant is that staff was instructed not to discuss the matter in the presence of patients due to concerns that it might interfere with their care. I find that to be a legitimate purpose and concern, and this claim without merit.

■ 45. Plaintiff Rubidoux also complains of allegedly unwarranted "anecdotal notes" being placed in her employment file. Such notes are placed in an employee's file to evidence concern with the employee's performance; they are taken into account during annual performance reviews, but are removed from the employee's file once the review is complete. Placement of an anecdotal note may be appealed through CMHIP's grievance process. Plaintiff Rubidoux complains of several anecdotal notes, including the following:

a. Plaintiff complains of a note that she was not sufficiently courteous with patients and their families. However, the note was destroyed roughly five months later because she was no longer perceived to have that

problem. There is no evidence of any adverse consequence to the Plaintiff or any proof that the note was anything but legitimate, corrective action.

b. Another note was written because Plaintiff Rubidoux approved a patient's leave without a doctor's written order which a nurse may not do except in an emergency. There was no such predicate emergency, but the Plaintiff claims she acted on a doctor's verbal order. Certainly that is a non-discriminatory reason for the anecdotal note and Plaintiff has not rebutted that justification. In fact, she appealed the note, but it was upheld.

c. Plaintiff complains she was unfairly given anecdotal notes for excessive "medication variances," i.e. errors in dispensing medication such as an inaccuracy in the type, dosage or recipient of medication, or inaccurate record keeping. The uncontested testimony, however, is that Plaintiffs rate of medication variances exceeded the norm and placement of the anecdotal notes was for legitimate, non-discriminatory purposes.

d. A final note concerned Plaintiff Rubidoux taking medication from an adjoining cottage for a patient in Cottage A without proper documentation. That note was upheld on appeal through the grievance process and no evidence was presented to show that it was anything other than a legitimate management response to errant behavior by the Plaintiff.

Accordingly, I find from the evidence that Defendant had legitimate, non-discriminatory reasons for each note and those reasons were not a pretext for retaliation or intentional discrimination.

■ 46. Plaintiff Rubidoux claimed that denial of certain vacation leave was also retaliation, yet I find that she was denied the vacation dates because more senior employees requested the same days off, again a legitimate, non-discriminatory reason.

■ 47. Plaintiff Rubidoux claims her transfer from Cottage A to Cottage B is

evidence of retaliation. As noted; there was tension among the staff in Cottage A following Jiminez's termination. CMHIP hired two outside consultants to assist the staff in resolving the situation, but Plaintiffs declined to participate because they had their own counselors. When no real progress was being made, management held a series of meetings to discuss solutions, including splitting up staff. Ms. Rubidoux and others, including those who had been Jiminez supporters, were chosen for transfer. Management gave Ms. Rubidoux three options of transfer and, although she had been opposed to transfer, she did not make any objection within the ten-day period provided by the state grievance system. The transfer did not change her pay, benefits, duties or seniority. Management placed a letter in her file that the transfer was not punishment and that she was commended for her assistance in alleviating a difficult working situation. CMHIP obviously was motivated by a legitimate need to resolve a problematic situation, not retaliation against the Plaintiff.

48. Plaintiff even claimed retaliation because she perceived that her opinion was not valued at staff meetings or that her statements were interrupted. I am unconvinced and observe that every action an employee perceives to be unfavorable should not be converted into a retaliation claim.

49. Finally, Plaintiff Rubidoux sought to somehow tie Defendant to anonymous, threatening letters and telephone calls she received after she gave her report about Jiminez's actions and filed her EEOC charge. Since there is no evidence linking those threats to the Defendant, they obviously cannot demonstrate retaliation.

50. Plaintiff Wisthoff's claims of retaliation likewise fail for lack of proof of any unjustified employment action or because the matters complained of were not brought to management's attention.

51. As an example, Plaintiff Wisthoff referred to two occasions when she was subjected to disciplinary action because of claims of her improper physical contact with a patient. Pursuant to established policy, action was taken pending investigations. In one instance, she was temporarily transferred to another cottage and, in the other, she was placed on administrative leave with pay. In one case, the claim was determined to be unfounded and, in the other, Plaintiff was found to have engaged in horse play for which she was given an anecdotal note, but suffered no other adverse employment action. The preponderance of the evidence is that both of these actions were legitimate employment acts, not arising from retaliatory motives.

52. In another instance, Plaintiff Wisthoff was relocated because she was accused of being romantically involved with a male co-worker. Prior to acting, management held hearings in accordance with the state civil service system and it was determined that it was more likely true than not that such involvement existed. Plaintiff was relocated to avoid contact with the male employee. All other terms of her employment remain unaffected. That decision has been upheld on several levels of appeal and there is no evidence that management's decision was actuated by retaliatory motive.

53. Other supposedly adverse employment action was that Plaintiff Wisthoff's phone calls and messages were not forwarded to her by co-employees or the shift coordinators. That was disputed by the relevant personnel and Plaintiff failed to meet her burden of proof.

54. Plaintiff also objected to being told by a supervising nurse to change into less tight pants. However, even though advised to object or complain to management, she did not do so. Hence, there is no proof that management even knew of the instruction and, if it did, whether it was retaliating against Plaintiff.

55. Plaintiff Wisthoff's claims of retaliation are also inconsistent with the undisputed testimony that her performance appraisals subsequent to Jiminez's termination have

been either good or very good (commendable) and that her position has been upgraded by management to improve her employment status.

*Damages*

56. Plaintiffs' evidence of damages is sparse at best. For Plaintiff Wisthoff no evidence was presented of any wage loss, past, present or future, and she appears to have conceded she has no such claim.

57. In her pleadings and argument, Plaintiff Rubidoux has asserted damages based upon the delay in raising her from a probationary nurse status (Nurse IA) to Nurse IB and then the failure to advance her to a category of Nurse II. With regard to the latter, since I have found that she has still not qualified for such advancement, there is no basis for such damages. With regard to the delay in advancement to the Nurse IB category, Plaintiff Rubidoux failed to produce competent evidence by which I could judge what that loss may be (Plaintiff did not produce evidence of her beginning pay or the amount of the raise she would have received by advancement from Nurse IA to Nurse IB either by direct testimony or documentary evidence such as pay stubs, W–2 forms, etc.). Accordingly, I find that there is insufficient evidence by which I could properly determine any wage claim.

58. The only concrete evidence of economic damage was the counseling expense each Plaintiff had incurred to the date of trial. Plaintiff Rubidoux incurred $1,200 with her counselor, Gloria Cordova, which I find a reasonable amount. Plaintiff Wisthoff incurred $2,000 in her therapy with Dr. Charles Bonney, her psychiatrist. Given the absence of any challenge by Defendant, I find that to be a reasonable amount.

59. Several experts of various qualifications testified. All agreed that Jiminez's sexual harassment caused psychological or psychiatric harm to Plaintiffs. However, there was a sharp division among the experts on the extent of that impact, particularly whether either or both Plaintiffs suffered from post trauma stress disorder.[1] ("PTSD").

60. PTSD, a diagnosis which originated in the treatment of combat soldiers, concerns the person's response or symptoms after having been exposed to a "traumatic event" where that person (1) "experienced, witnessed or was confronted with an event or events that involved actual or threatened death or serious injury, or a threat to the physical integrity of self;" and (2) "the person's response involved intense fear, helplessness, or horror." American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders,* 427–428 (4th ed.1994).

61. Plaintiffs sought to claim not only that each suffered from PTSD as a result of Jiminez's actions, but also that they would require regular therapy for the rest of their respective lives, claiming significant damages based upon ongoing counseling fees.

62. Plaintiffs' claims cannot be reconciled with Defendant's expert, Dr. Kathleen Matthews, a well qualified psychiatrist. She concluded that Plaintiff Rubidoux did not suffer from PTSD. Instead, Dr. Matthews diagnosed her with adjustment disorder for which Plaintiff Rubidoux's prognosis was excellent in that her symptoms are expected to remit when this litigation is resolved, although Dr. Matthews suggested two or three months of psychotherapy to help finally resolve Plaintiff Rubidoux's condition.

63. With regard to Plaintiff Wisthoff, Dr. Mathews did find PTSD arising from spousal abuse (threats to her life by holding a gun to her head and hitting and choking her son, either of which could qualify for the stressing event of PTSD) which may have been aggravated by her experiences with Jiminez. Regardless, however, she found that the symptoms of PTSD were resolving for Plaintiff Wisthoff and her diagnosis was otherwise dysthymic disorder and alcohol abuse (in re-

---

**1.** The American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 424–29 (4th ed.1994), uses the terminology "posttraumatic stress disorder."

mission). Dr. Mathews found significant improvement in Plaintiff Wisthoff coinciding with Plaintiff Wisthoff leaving her husband and ceasing alcohol use. Dr. Mathews feels Plaintiffs prognosis is excellent, although she recommends three months of weekly therapy to address the remaining issues of sexual harassment and another three months of therapy to help resolve issues related to staff conflicts.

64. Based upon her testimony, background, and investigation and study of Plaintiffs, I find Dr. Mathews to be highly credible. Accordingly, I find that neither Plaintiff now suffers from PTSD as a result of Jiminez's harassment. I also find that their other disorders have been or will be successfully resolved with approximately three months of weekly therapy. To the extent opinions of Plaintiffs' expert witnesses are inconsistent with these conclusions, I find them not credible and entitled to little, if any, weight.

65. I find and conclude that each Plaintiff is entitled to additional damages of $2,000 for psychotherapy to assist in finally resolving the disorders resulting from their harassment by Jiminez.

66. Turning to non-economic damages, I find that both Plaintiffs suffered emotional pain and distress as a consequence of Jiminez's repugnant conduct. Given the totality of the circumstances of this case, however, I find that $20,000 is reasonable compensation for Plaintiff Rubidoux's pain and suffering damages and $15,000 are reasonable pain and suffering damages for Plaintiff Wisthoff.

## CONCLUSIONS OF LAW

Based upon the foregoing findings of fact, I make the following legal conclusions:

1. Both Plaintiffs have made the required threshold showing to make a hostile work environment sexual harassment claim that each was subjected to unwanted sexual conduct by her supervisor which had "the purpose or effect of unreasonably interfering with [each Plaintiffs] work performance or creating an intimidating, hostile, or offensive working environment." *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986); *Hirschfeld v. New Mexico Corrections Dept.,* 916 F.2d 572, 575 (10th Cir.1990).

2. Under the law of this Circuit developed pursuant to the *Meritor* decision, the Restatement (Second) of Agency § 219 has been adopted to provide three alternative bases for employer liability for hostile work environment: (1) harassment by an employee acting within the scope of his or her employment; (2) acts committed by an employee if the employer was negligent or reckless; and (3) acts where the employee purported to act or speak on behalf of the principal and there was reliance on that apparent authority or the employee was aided in the act by the existence of the agency relation. *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1418 (10th Cir.1987). As is virtually always the case, there is no liability here on the first ground as sexual harassment was obviously not within the scope of Jiminez's employment.

3. For liability under the second basis, it must be shown that CMHIP was negligent in remedying or preventing the hostile work environment of which it knew or should have known. *Hirschfeld v. New Mexico Corrections Dept.,* 916 F.2d at 577. Since management personnel neither knew nor should have known of the harassment, and in fact took immediate and prompt action once aware of it, CMHIP cannot be liable pursuant to the second alternative basis under *Hicks.*

4. Notwithstanding the absence of actual or constructive knowledge by high level management personnel, I conclude that CMHIP is liable to both plaintiffs for hostile work environment sexual harassment as a result of Jiminez's acts under the third *Hicks* alternative for liability. In my earlier opinion in this matter, *Rubidoux v. Johnston,* 954 F.Supp. 1477 (D.Colo.1997), I concluded on the basis of *Sauers v. Salt Lake County,* 1 F.3d 1122 (10th Cir.1993), that if the harassing supervisor had significant control over

the victims hiring, firing or conditions of employment, the employer could be liable regardless of its actual or constructive knowledge of the supervisor's conduct. *Rubidoux v. Johnston,* 954 F.Supp. at 1482. That reading and ruling presaged the Tenth Circuit opinion of *Harrison v. Eddy Potash, Inc.,* 112 F.3d 1437 (10th Cir.1997). Drawing upon *Karibian v. Columbia University,* 14 F.3d 773, 780 (2d Cir.1994), the court concluded that, where a supervisor such as Jiminez uses his actual or apparent authority to assist his harassment, the employer is liable under the third *Hicks* alternative even though the employer had in place a sexual harassment policy which was known to the plaintiff. *Harrison v. Eddy Potash, Inc.,* 112 F.3d at 1446. As I earlier concluded, this liability attaches even though higher management did not have notice. *See Karibian v. Columbia University,* 14 F.3d at 780. *Harison* also makes clear that this liability results even though the supervisor such as Jiminez is not a member of top-level management. 112 F.3d at 1447–48. Specifically, "the fact that the supervisor has actual or apparent authority to control the victim's working environment, and was aided in harassing the victim by that authority, is sufficient to establish employer liability under the [third *Hicks basis*]." *Id.* at 1450. That is precisely the case here.

5. To prevail on their *quid pro quo* claims, each Plaintiff must show that a concrete employment benefit or the avoidance of adverse consequences was expressly or implicitly conditioned on her submission to sexual demands by a supervisor or manager who had actual or apparent authority to confer the benefit or impose adverse consequences. *Hicks v. Gates Rubber Co.,* 833 F.2d at 1413–14. I have found that Jiminez had the actual or apparent authority to affect the terms and conditions of plaintiffs' employment and used that authority to condition their employment benefits or avoidance of adverse results upon their submission to his unwelcome sexual conduct. Accordingly, I conclude that defendant is liable for *quid pro quo* sexual harassment of each Plaintiff.

6. To prove retaliation, a plaintiff must show that (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse action. *Burrus v. United Tel. Co. of Kansas,* 683 F.2d 339, 343 (10th Cir. 1982); *Archuleta v. Colorado Dept. of Institutions,* 936 F.2d 483 (10th Cir.1991). Here, I have found that there were but a few adverse employment actions, each of which was fully justified and not the result of, or related to, Plaintiffs' protected activity. Accordingly, I find for defendant on each Plaintiff's retaliation claims.

■ 7. Plaintiffs persist in wrongfully claiming entitlement to punitive damages. No punitive damages are recoverable under Title VII against a governmental agency such as Defendant. 42 U.S.C. § 1981a(b)(1).

## ORDER AND JUDGMENT

Accordingly, it is ORDERED:

1. Judgment is entered in favor of Plaintiff Lillian Rubidoux and against Defendant Colorado Mental Health Institute of Pueblo in the amount of $23,200 on her *quid pro quo* and hostile work environment sexual harassment claims.

2. Judgment is entered in favor of Plaintiff Dana Wisthoff and against Defendant Colorado Mental Health Institute of Pueblo in the amount of $19,000 on her *quid pro quo* and hostile work environment sexual harassment claims.

3. Judgment is entered in favor of Defendant Colorado Mental Health Institute of Pueblo and against both Plaintiffs on their claims of retaliation.

4. Plaintiffs may have their allowable costs from Defendant upon filing a Bill of Costs within 15 days of the mailing of this Judgment.

5. Plaintiffs may file a motion for award of attorney fees, with supporting affidavits,

within 20 days of the date hereof and Defendant may respond within 20 days thereafter.